1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCHIE CRIPPEN,<br><br>                    Plaintiff,<br><br>            v.<br><br>CITY OF FRESNO, and DOES 1<br>through 40, inclusive<br><br>                    Defendants. | 1:03-CV-6818 OWW DLB<br><br>ORDER GRANTING DEFENDANT<br>CITY OF FRESNO'S MOTION FOR<br>SUMMARY JUDGMENT<br>(Rule 56, F.R.Civ.P.) |

## I.   INTRODUCTION

Defendant City of Fresno ("City") moves for summary judgment against Plaintiff Archie Crippen ("Plaintiff").  Plaintiff opposes the motion.

## II.   PROCEDURAL HISTORY

Plaintiff filed the complaint on December 11, 2003.  Doc. 1, Compl.  Plaintiff filed the first amended complaint ("FAC") on June 17, 2004.  Doc. 18, FAC.  The City's answer was filed on August 3, 2004.  Doc. 20, Answer.  The City moved for summary judgment on February 13, 2006.  Doc. 58, Mot. for Summ. J.; Doc.

1

59, Mem. in Supp.  Plaintiff filed opposition on March 3, 2006.
Doc. 81, Mem. in Opp.  City replied on March 6, 2006.  Doc. 99,
Resp. in Supp.

### III.  BACKGROUND

The following facts are undisputed.  1. On or about January
11, 2003, a debris pile on Plaintiff's real property at 495 North
Marks Avenue, Fresno, California, caught fire.  2. Plaintiff
operated demolition and recycling businesses on the property, and
had allowed debris from these and other activities to accumulate
into a pile that covered approximately five acres, and ranged in
height from fifteen to thirty feet.

3. Suppressing the fire took thirty days, and cost in excess
of two million dollars.  4. Due to the size and complexity of the
effort required, the City called on the resources of various
state and federal agencies, including the United States
Environmental Protection Agency.  The City also declared a local
emergency as a result of the fire.

6. After the fire, Plaintiff was cited for numerous
violations of state statutes and municipal codes.  7. Since
Plaintiff did not have the resources to remove the seventy-five
thousand tons of charred debris remaining on his property after
the fire, the City had to do so, at a cost to the City of more
than six million dollars.

8. Subsequently, the conditional use permits by which
Plaintiff had been allowed to conduct his businesses on the
property were revoked; his low bid on a City demolition project
was rejected on the grounds that he was a "non-responsible
bidder"; and his applications for the demolition permits which he

**2**

1  had to seek from the City in order to perform demolition work
2  were subjected to a special procedure that resulted in delays in
3  their issuance.

4      9. Plaintiff alleges that these actions by the City violate
5  his right to the equal protection of the laws, in violation of
6  the Fourteenth Amendment to the United States Constitution.   10.
7  He brings suit under the Civil Rights Act, Title 42, Section
8  1983, of the United States Code.

9                       **IV.   LEGAL STANDARD**

10     Summary judgment is warranted only "if the pleadings,
11  depositions, answers to interrogatories, and admissions on file,
12  together with the affidavits, if any, show that there is no
13  genuine issue as to any material fact."   Fed.R.Civ.P. 56(c); *Cal.*
14  *v. Campbell,* 138 F.3d 772, 780 (9th Cir. 1998).   Therefore, to
15  defeat a motion for summary judgment, the non-moving party must
16  show (1) that a genuine factual issue exists and (2) that this
17  factual issue is material.   *Id.*   A genuine issue of fact exists
18  when the non-moving party produces evidence on which a reasonable
19  trier of fact could find in its favor viewing the record as a
20  whole in light of the evidentiary burden the law places on that
21  party.   *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216,
22  1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*,
23  477 U.S. 242, 252-56 (1986).   Facts are "material" if they "might
24  affect the outcome of the suit under the governing law."
25  *Campbell,* 138 F.3d at 782 (*quoting Anderson,* 477 U.S. at 248).
26  The nonmoving party cannot simply rest on its allegations without
27  any significant probative evidence tending to support the
28  complaint.   *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th

**3**

Cir.2001).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex Corp. v. Catrell,* 477 U.S. 317, 322-23 (1986).

The more implausible the claim or defense asserted by the non-moving party, the more persuasive its evidence must be to avoid summary judgment.  *See United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.,* 85 F.3d 407, 410 (9th Cir. 1996).

### V.  ADDITIONAL UNDISPUTED MATERIAL FACTS

11. On or about January 11, 2003, a debris pile on Plaintiff's property caught fire.  SUMF, #1.  12. As a result of the fire, the City issued a declaration of local emergency.  SUMF, #2.  13. Because of the magnitude and complexity of the fire, the City utilized the assistance of federal, state and other agencies.  SUMF, #4.  14. In the last 15 years, the City never had to go beyond Fresno County for resources to suppress a

**4**

fire.  SUMF, #5.  15. Despite the infusion of outside resources, it took approximately 30 days to suppress the fire.  SUMF, #15. 16. Plaintiff's debris pile contained primarily wood products. SUMF, #17.  17. The pile covered approximately five acres, and ranged from 15-30 feet in height.  SUMF, #18.  18. The cost to suppress the fire was in excess of two million dollars.  SUMF, #19.  19. Plaintiff told the City that he was financially unable to properly dispose of the waste material that existed on his property in violation of law.  SUMF, #21.  20. As a result, government agencies had to remove approximately 75,000 tons of debris at a cost of over two million dollars.  SUMF, #22.  21. While the fire was still being suppressed, the City issued a cease operations ("red tag") order to Plaintiff.  SUMF, #26.  22. Plaintiff violated the cease operations order and continued operations.  SUMF, #27.

## VI.   ANALYSIS

Plaintiff claims that City violated his right to the equal protection of the laws in four ways: (1) by revoking his conditional-use permits (CUPs) after the fire; (2) by applying to him alone a policy which resulted in delays in the issuance of demolition permits; (3) by rejecting his bid for a City demolition project on the grounds that he was a "non-responsible bidder"; and (4) by "singling him out to bear the burden of the City's attempt to bring credibility to its Code Enforcement and other departments."  Doc. 81, Mem. in Opp., 2.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is

**5**

essentially a direction that all persons similarly situated
should be treated alike. *City of Cleburne v. Cleburne Living
Center*, 473 U.S. 432, 439 (1985); *see also Honolulu Weekly, Inc.
v. Harris*, 298 F.3d 1037, 1047(9th Cir. 2002).

Plaintiff brings his equal-protection claims as a "class of
one" under Title 42, Section 1983, of the United States Code.
Doc. 81, Mem. in Opp., 12.  The equal-protection guarantee
protects not only groups, but individuals who would constitute a
"class of one." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564
(2000); *SeaRiver Maritime Fin. Holdings, Inc. v. Mineta,* 309 F.3d
662, 679 (9th Cir. 2002).  Where, as here, state action does not
implicate a fundamental right or a suspect classification, the
plaintiff can establish a "class of one" equal protection claim
by demonstrating that he has been intentionally treated
differently under the law from others similarly situated and that
there is no rational basis for the difference in treatment.
*Olech,* 528 U.S. at 564.  Where an equal-protection claim is based
on "selective enforcement of valid laws," a plaintiff can show
that the defendants' rational basis for selectively enforcing the
law is a pretext for "an impermissible motive." *Squaw Valley
Development Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004).

1.  Revocation of Plaintiff's CUPs

Plaintiff holds contractor's licenses in earthwork and
paving and demolition.  Doc. 81, Mem. in Opp., 6.  Plaintiff also
owns and operates truck scales and a concrete-asphalt recycling
business; he conducts these operations on his property located at
495 North Marks Avenue.  Id.  On or about November 20, 1980, the
County of Fresno issued CUP No. C-1764 to Plaintiff, allowing him

1  to process concrete, asphalt, and other materials at the Marks
2  site.  Pl.'s Resp. and Opp. to Def.'s Statement of Undisputed
3  Material Facts [hereinafter, "SUMF"], #83.  Upon the annexation
4  of the Marks Avenue property by the City in or about 1983, this
5  CUP was grand-fathered to include the Marks Avenue site.  SUMF,
6  #85.

7       Beginning around 1988, Plaintiff's business included the
8  storage, processing, and recycling of wood which resulted from
9  the demolition of structures.  On December 9, 1994, the City
10 issued Plaintiff a revised CUP, No. C-94-120, allowing him to
11 expand his operation onto the property located at 3230 West
12 Nielsen Avenue in Fresno.  Pet. for Writ of Admin. Mand., Sup.
13 Ct. Case No. 03 CE CG 01766, 2-3. (attached as Ex. A to Doc. 62,
14 Def.'s Request for Jud. Notice).

15      After the fire, on March 7, 2003, Nick P. Yovino, Director
16 of the Planning and Development Department and the Building
17 Official of the City, sent Plaintiff a notice that his CUP had
18 been revoked.  The letter cited violations of both the City and
19 County CUPs, the zoning ordinance, and the municipal code.  SUMF,
20 #121.

21      Plaintiff appealed to the City Planning Commission, which,
22 after a hearing conducted on April 30, 2003, upheld Director
23 Yovino's decision.  Pet. for Writ of Admin. Mand., 4-5; SUMF,
24 #25.

25      Plaintiff initially sought judicial review of the Planning
26 Commission's ruling in Fresno County Superior Court, Case No. 03
27 CE CG 01766.  Before the State Court considered Plaintiff's
28 request for Administrative Mandamus, he dismissed it voluntarily

**7**

1  on December 8, 2003.  SUMF, #142; Request for Dismissal and

2  Notice of Entry of Dismissal (attached as Ex. F to Doc. 62,

3  Def.'s Request for Jud. Notice).  No ruling was issued by the

4  Superior Court.

5  Res Judicata Effect of the Planning Commission's Decision

6       Defendant argues that Plaintiff's failure to exhaust his

7  judicial remedies bars the court from considering Plaintiff's

8  Section 1983 claim regarding the Planning Commission's decision.

9  "'Res judicata' describes the preclusive effect of a final

10  judgment on the merits.  Res judicata, or claim preclusion,

11  prevents re-litigation of the same cause of action in a second

12  suit between the same parties or parties in privity with them.

13  'Collateral estoppel,' or 'issue preclusion,' precludes re-

14  litigation of issues argued and decided in prior proceedings.

15  Under the doctrine of res judicata, if a plaintiff prevails in an

16  action, the cause is merged into the judgment and may not be

17  asserted in a subsequent lawsuit; a judgment for the defendant

18  serves as a bar to further litigation of the same cause of

19  action." *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 896-97

20  (2002).

21       The Supreme Court has held that res judicata may be applied

22  to administrative agency actions when (1) an administrative

23  agency acts in a judicial capacity and (2) resolves disputed

24  issues of fact properly before it (3) which the parties have had

25  an adequate opportunity to litigate.  *See Public Utility Dist.*

26  *No. 1 of Snohomish County v. Federal Emergency Management Agency*,

27  371 F.3d 701, 708 (9th Cir. 2004).  If these requirements are

28  satisfied, the federal courts are to give the state agency's

**8**

1  decision the same preclusive effect the decision would have in
2  that state's courts.  *Olson v. Morris*, 188 F.3d 1083, 1086 (9th
3  Cir. 1999).

4       Under California law, failure to challenge an agency's
5  decision rendered in its judicial capacity entitles that decision
6  to preclusive effect in all subsequent actions.  *Johnson v. City*
7  *of Loma Linda*, 24 Cal.4th 61, 69 (2000).

8       An administrative agency decision has collateral estoppel
9  effect when the decision and the agency's prior proceedings
10 possess a judicial character.  Indicia of proceedings undertaken
11 in a judicial capacity include a hearing before an impartial
12 decision maker; testimony given under oath or affirmation; a
13 party's ability to subpoena, call, examine, and cross-examine
14 witnesses, to introduce documentary evidence, and to make oral
15 and written argument; the taking of a record of the proceeding;
16 and a written statement of reasons for the decision.  *Pacific*
17 *Lumber Co. v. State Water Resources Control Bd.*, 37 Cal.4th 921,
18 944 (2006) (citations omitted).

19      The Planning Commission's decision was made under
20 circumstances that satisfy the judicial capacity requirement.
21 The Fresno City Municipal Code authorizes the Commission to hear
22 appeals from the Director's decisions.  City of Fresno Municipal
23 Code, Art. 4.  At the hearing, Plaintiff was represented by
24 private counsel of his choice.  SUMF, #129.  The parties had an
25 opportunity to present argument, introduce witness testimony,
26 cross-examine witnesses, introduce documentary evidence and to
27 object to evidence.  Id., #130.  Plaintiff was not precluded from
28 introducing any witness or documentary evidence.  Id., #131.

**9**

1  Witnesses were placed under oath and the proceeding was

2  transcribed by a court reporter.  Id., #132.  The City had the

3  burden of proof.  Id., #133.  The hearing lasted approximately

4  five hours.  Id., #134.  Plaintiff presented argument and

5  evidence that Plaintiff did not violate conditions of his CUPs,

6  did not create a health and safety problem or public nuisance for

7  other citizens, did not violate the law and that the City agreed

8  to his operations.  Id., #135.  The Planning Commission rejected

9  Plaintiff's defenses, found him in violation of numerous CUP

10 requirements, and directed that its findings be reduced to

11 writing.  Id., #136.  The parties had an opportunity to be heard

12 with respect to the proposed findings and resolution.  Id., #137.

13      Plaintiff voluntarily dismissed his suit for administrative

14 mandamus before the Superior Court had the opportunity to review

15 the Commission's decision against Plaintiff.  Request for

16 Dismissal and Notice of Entry of Dismissal (attached as Ex. F to

17 Doc. 62, Def.'s Request for Jud. Notice).  The agency decision is

18 a final decision on the merits.  The California courts afford the

19 Commission's decision preclusive effect, *Johnson*, 24 Cal.4th at

20 69.  Under the Full Faith and Credit Clause, a federal court must

21 give the Planning Commission's final decision the same effect.

22 *Olson*, 188 F.3d at 1086; 28 U.S.C. § 1738.

23      Plaintiff claims that the Planning Commission did not afford

24 him an adequate and meaningful opportunity to contest the

25 revocation of his CUPs.  *See FEMA*, 371 F.3d at 708.  His sole

26 ground for this claim is that the City allegedly suppressed the

27 report of the State Fire Marshal, which Plaintiff characterizes

28 as "exculpatory evidence."  *See, e.g.*, SUMF, ##130, 131, 135.

1    Plaintiff had the right to subpoena the Fire Marshal's
2    report, to present it to the Planning Commission, and to seek
3    review in the judicial mandamus proceeding before the Superior
4    Court that the City's alleged suppression of the report denied
5    him a fair opportunity to litigate before the Commission.  In
6    fact, he did raise this issue in his Administrative Mandamus Writ
7    Petition, before voluntarily dismissing the Petition.  *See* Pet.,
8    ¶ 17(a).  Res judicata bars the court from considering a
9    collateral attack on the Commission's decision to revoke
10   Plaintiff's CUPs in the absence of Plaintiff's exhaustion of his
11   judicial remedies in state court.  *Misischia v. Pirie*, 60 F.3d
12   626, 630 (9th Cir. 1995); *Johnson*, 24 Cal.4th at 69.

13   Plaintiff argues that res judicata should not bar this cause
14   of action because the rights being litigated are not the same.
15   Before the Planning Commission, Plaintiff defended his property
16   right to retain his CUPs.  Here, he seeks a ruling that the
17   revocation of his CUPs violated his federal constitutional equal-
18   protection rights.  Doc. 81, Mem. in Opp., 28.

19   In *Olson*, a Section 1983 plaintiff sought a ruling in
20   federal court that the revocation of his psychologist's license
21   by the State governing board violated his First Amendment
22   constitutional right to religious freedom.  *Olson*, 188 F.3d at
23   1085.  Like Plaintiff, Olson could have obtained judicial review
24   of the decision, but did not; instead, he filed suit in federal
25   court.  Olson also argued that claim preclusion did not apply,
26   because the right at issue before the agency, his license and
27   right to practice a profession, was different from the right at
28   issue before the court, his First Amendment civil rights.  The

**11**

1  court rejected this argument, stating:

2      Our examination of the record reveals that the state

3      administrative process here comported with the

4      requirements of [*United States v.*] *Utah Construction* [*&*

5      *Mining Co.*, 384 U.S. 394, 422 (1966)].  If Olson had

6      constitutional defenses to the Board's proceedings, he

7      had every right to raise them with the Board or on

8      appeal in state court.  Olson's only stated explanation

9      for not asserting his constitutional defenses more

10     vigorously before the Board is that he did not

11     anticipate losing.  But lose he did, and the doctrine

12     of res judicata bars litigating it again.

13  *Olson*, 188 F.3d 1083, 1086-87; *accord*, *Miller v. County of Santa*

14  *Cruz*, 39 F.3d 1030, 1034-35 (9th Cir. 1994).  Plaintiff's claim

15  is indistinguishable.  His civil rights claim is barred by

16  failure to exhaust.

17  <u>No Similarly Situated Parties</u>

18      Even if the civil rights claim was not precluded by

19  Plaintiff's failure to exhaust his state judicial remedies,

20  Plaintiff has not identified a class to which he is similarly

21  situated in ways "rationally related to the government's

22  mission."  *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455

23  (7th Cir. 2002).

24      The test is whether a prudent person, looking

25      objectively at the incidents, would think them roughly

26      equivalent and the protagonists similarly situated.

27      Much as in the lawyer's art of distinguishing cases,

28      the 'relevant aspects' are those factual elements which

**12**

1    determine whether reasoned analogy supports, or
2    demands, a like result.  Exact correlation is neither
3    likely nor necessary, but the cases must be fair
4    congeners.  In other words, apples should be compared
5    to apples.
6    *Barrington Cove Ltd. Partnership v. Rhode Island Housing and*
7    *Mortg. Finance Corp.*, 246 F.3d 1, 8 (1st Cir. 2001).

8        *Squaw Valley Development Co. v. Goldberg*, a class-of-one
9    equal-protection claim alleging disparate enforcement of
10   environmental regulations, addresses the "similarly situated"
11   requirement:

12       Here, Squaw Valley contends it is being singled out
13       from all other dischargers.  However, it presents no
14       evidence that any other discharger is of comparable
15       size, has a comparable history of non-compliance,
16       engages in a comparable level of activity on its land,
17       and has a comparable history of administrative action
18       being ineffective.  As the district court repeatedly
19       stated, Squaw Valley is not comparing "apples to
20       apples."
21   *Squaw Valley*, 375 F.3d 936, 945 (9th Cir. 2004).

22       A comparison between Plaintiff and any other allegedly
23   similarly situated party subject to comparable conditions of a
24   CUP for a comparable land fill or recycling facility must be
25   made.  The Commission found that the conflagration that broke out
26   on Plaintiff's property resulted directly from Plaintiff's
27   numerous violations of his CUPs – particularly, violation of the
28   requirements that a maximum of only ten percent of the material

**13**

on his property consist of combustibles, and that the use be limited to "processing," not storage.  Fresno Planning Comm'n Resol. No. 11850, at 2, 4.  (attached as Ex. B to Decl. of Thomas J. Riggs).  Plaintiff has failed to identify any admissible evidence of a class of, or any, other site operators to whom he rationally.

Plaintiff argues that there are triable issues of fact whether Plaintiff is situated similarly to, but treated differently from, "the City and other holders of CUPs."  Doc. 81, Mem. in Opp., 20.  Plaintiff argues that "the evidence shows the City itself believed it was similarly situated with [Plaintiff]."  Id.  What the City believed is not relevant to the issue of whether it was situated similarly to any other party.  Plaintiff's evidence raises the issue whether the City has violated its own CUPs.  See Sep. Statement of Disputed Facts [hereinafter "SSDF"] ##92, 93, 97, 100. (attached as Ex. 2 to Doc. 81, Mem. in Opp.).  Plaintiff's evidence also raises the issue whether a fire broke out on land for which a CUP had been issued to the City.  SSDF #96.  However, Plaintiff's evidence does not show that any City CUP violation caused a local emergency to be declared based on health and safety threats to the public, required the help of state and federal agencies, took thirty days to fully contain, or imposed comparable costs on the public, or that the City was not financially responsible.  Plaintiff's evidence also does not show that the City defied a red tag order to cease operations.  *Supra.*  Any rational appraisal of these facts shows no similarity between Plaintiff and any other party.  Plaintiff's inability to meet the

**14**

comparability requirement results from Plaintiff's own conduct. Plaintiff presents no evidence that any other party shares any relevant characteristics with him.

Finally, based on the numerous CUP violations which the Commission justifiably found, Plaintiff cannot establish that the City's revocation of Plaintiff's CUPs is entirely irrational or in any way unjustified.  Under rational-basis review, Plaintiff bears the burden of negating every conceivable basis on which the government may have relied to revoke his CUPs. *See, e.g.*, *Rui One Corp. v. City of Berkeley*, 371 F.3d 1137, 1155 (9th Cir. 2004).  It was not irrational for the City to revoke Plaintiff's CUPs in view of his gross violation of their conditions, and the substantial damage to the City and public safety that resulted from Plaintiff's violations.

In its decision upholding Director Yovino's March 7, 2003, revocation of Plaintiff's CUPs, the Planning Commission found numerous violations both of the CUPs and of the Zoning Ordinance. These included:

- [Plaintiff] brought materials onto the Site other than concrete, asphalt, and Group III [non-combustible] materials.  A large debris pile on the Site contained a wood content estimated to range from 40 to 90 percent.  The Site also contained large amounts of metal and other trash and debris.

- The CUP limited the use on the Site to "processing." [Plaintiff] established a debris pile [covering] nearly five acres [and] upon to 30 feet in height.

- The accumulation existed for at least seven years and far

**15**

exceeded the 180-day transit storage permitted in a "processing" use.

- [Plaintiff] expanded the CUP operation and other operations not permitted by the CUP or zoning onto a 5-acre vacant parcel [ ] without a City entitlement or City approval.

- [Plaintiff] operated a public scale without a City entitlement or City approval.

- [Plaintiff] expanded his operation to encroach upon a neighbor's property without a City entitlement or City approval.

- [Plaintiff] operated the Site as a landfill without a City entitlement or City approval.  The landfill consisted of large amounts of trash, garbage, and debris intermixed with large amounts of earth and dirt.

- [Plaintiff] operated on the Site a motor vehicle wrecking yard, and a junk, rag, and scrap iron storage yard without a City entitlement or City approval.

- Eighty disabled truck tractors, various car parts, inoperable cars, pipes of iron and steel, industrial I-beams, sheet metal, metal tanks, and metal drums were found on the Site.

- [Plaintiff] operated on the Site a dump without a City entitlement or City approval.

- [Plaintiff] operated a wood waste recycling business on the Site without a City entitlement or City approval.  Wood waste recycling is not a permitted use under the CUP, and is not permitted in a M-2 zone district without a site plan approval and environmental assessment.

16

1   •       [Plaintiff] did not obtain a site plan approval or

2           environmental assessment for wood waste recycling.

3   Fresno Planning Comm'n Resol. No. 11850, at 2-3 (attached as Ex.

4   B to Decl. of Thomas J. Riggs).

5       The Planning Commission found Plaintiff's violations of the

6   Fresno Municipal Code, the Uniform Fire Code, and the California

7   Civil Code created a public nuisance:

8   •       [Plaintiff] created a public nuisance by the storage of

9           refuse, debris, garbage, scrap metal or lumber, concrete,

10          asphalt, and tires and without a City entitlement or City

11          approval.

12  •       [Plaintiff] created a public nuisance by the storage of

13          combustible materials likely to become easily ignited, and

14          without a City entitlement or City approval.

15  •       [Plaintiff] created a public nuisance by permitting the

16          existence of abandoned, wrecked, dismantled, or inoperative

17          vehicles, and without a City entitlement or City approval.

18  •       [Plaintiff] created a public nuisance by parking or storing

19          vehicles on unpaved surfaces, and without a City entitlement

20          or City approval.

21  •       [Plaintiff] created a public nuisance by violating multiple

22          provisions of the Fresno Zoning Ordinance, including

23          Sections 12-411-A-B, 12-227.1, 12-227.3, 12-228.3-B-18, 12-

24          228.3-B-9, 12-228.3-B-25, 12-302.A and B, and 12-408.

25  Id., 3.

26      The Planning Commission found Plaintiff's violations of the

27  Uniform Fire Code created a public nuisance.

28  •       [Plaintiff] failed to provide adequate fire access roads to

**17**

1     the Site.

2 •     [Plaintiff] failed to provide an adequate water supply for

3     fire-fighting purposes on the Site.

4 •     [Plaintiff] failed to provide adequate fire safety lanes

5     separating portions of the debris pile.

6 •     [Plaintiff] created a debris pile in excess of 25 feet in

7     height, 150 feet in width, and 250 feet in length.  The

8     debris pile was up to 30 feet in height, 300 feet in width,

9     and 600 feet in length covering nearly five acres.

10 •     [Plaintiff] intentionally violated a lawful City "red tag"

11     [cease operations] order which prohibited entering or

12     occupying the Site or any buildings thereon.

13 •     [Plaintiff] violated Uniform Fire Code Sections 902.1,

14     903.1, 3008.1, 103.4.3.2, and 103.4.3.3, thereby creating a

15     public nuisance.

16 Id., 3-4.

17 <u>Pretext for Discriminatory Enforcement</u>

18     Plaintiff alleges that there is a disputed issue of fact

19 regarding whether City's purported rational bases for revoking

20 his CUPs are merely pretextual.  Plaintiff alleges that the true

21 motivation for the revocation was animus resulting from the

22 City's embarrassment at the magnitude of the violations.  Doc.

23 81, Mem. in Opp., 21.

24     In this circuit it is clearly established that a plaintiff

25 may pursue an equal protection claim by raising a triable issue

26 of fact as to whether the defendants' asserted rational basis is

27 **merely** a pretext for differential treatment.  *Armendariz v.*

28 *Penman,* 75 F.3d 1311, 1327 (9th Cir. 1996) (finding equal-

**18**

protection case law clearly established that city officials could
not target plaintiffs for overzealous enforcement of housing
code); *Fajardo v. County of Los Angeles,* 179 F.3d 698, 700 n.2
(9th Cir. 1999) ("If Defendants' justification for discriminating
against domestic-violence crimes is **nothing more** than pretextual,
then Defendants' actions are arbitrary and violate the Equal
Protection Clause.").

On summary judgment, an equal protection plaintiff may show
pretext by creating a triable issue of fact that either: (1) the
proffered rational basis was objectively false; or (2) the
defendant actually acted based on an improper motive. *See Patel
v. Penman,* 103 F.3d 868, 876 (recognizing that pretext might be
shown if the city was "using its code enforcement process not to
enforce compliance with the codes but rather to drive ...
downtown motels out of business"); *Armendariz,* 75 F.3d at 1327
(finding "a triable issue of fact as to whether the [city's]
asserted rationale of directing efforts to enforce the housing
code in high-crime areas was merely a pretext" to reduce property
values for the city to purchase them at a reduced rate); *Lockary
v. Kayfetz,* 917 F.2d 1150, 1155 ("Although a water moratorium may
be rationally related to a legitimate state interest in
controlling a water shortage" the plaintiffs raised a triable
issue of fact regarding the "very existence of a water
shortage"). *Squaw Valley Development Co. v. Goldberg*, 375 F.3d
936, 945-46 (9th Cir. 2004).

In *Armendariz*, owners of low-income housing brought Section
1983 suits against officials of the City of San Bernardino,
alleging that conducting sweeps and over-enforcing the housing

**19**

1  code to re-locate criminals violated equal protection.  The City
2  had begun vigorously enforcing its housing code several years
3  previously, resulting in the condemnation of many low-income
4  housing units, the eviction of suspected criminals, and the
5  revocation of property owners' business licenses.  The City did
6  not provide advance warning of the sweeps and did not tell the
7  owners why their buildings were being shut down until weeks
8  afterwards.  "When the closure notices did arrive, they were
9  either worded so vaguely as to be unhelpful or cited seemingly
10 minor . . . violations." *Armendariz*, 75 F.3d at 1313.

11     The City justified its actions by citing a provision of the
12 municipal code which authorized the building official to close
13 buildings that he deemed immediately dangerous.  Plaintiffs
14 argued that this was merely a pretext for one of two real
15 motives: (1) to force gang members to re-locate outside the City,
16 or (2) to allow a commercial developer to acquire the property at
17 a steep discount, raze the low-income housing units, and replace
18 them with a shopping center. *Armendariz*, 75 F.3d at 1314-15.

19     The court of appeals upheld the district court's denial of
20 summary judgment on plaintiffs' equal-protection claims.

21     [P]laintiffs relied primarily on an affidavit submitted
22     by John Edwins, a commercial developer, to support
23     their claim that the defendants were motivated by a
24     desire to acquire the plaintiffs' properties and
25     replace the low-income housing units with commercial
26     development.  Edwins stated that he had met with [Mayor
27     William] Holcomb, [City Attorney James] Penman, and
28     other city officials to discuss and plan a proposed

**20**

1  commercial center on property then occupied by the

2  plaintiffs' buildings.  According to Edwins, Holcomb

3  wanted to demolish or relocate the plaintiffs'

4  buildings and replace them with commercial development

5  and asked Edwins to purchase the buildings as a third

6  party "strawman" so that the City's Redevelopment

7  Agency could subsequently purchase them from him.  In

8  an effort to mitigate the City's costs of relocating

9  the buildings' tenants and to suppress the value of the

10  plaintiffs' properties, Edwins, Holcomb, and Penman

11  discussed methods of preventing the plaintiffs from

12  renting currently vacant apartments to tenants.  Edwins

13  suggested the possibility of removing the utility

14  meters from unoccupied buildings; once the meters were

15  removed, the plaintiffs could not rent the apartments

16  without applying to the City for permits.  On December

17  6, 1990, at the request of Holcomb, Edwins delivered to

18  Penman an inventory of buildings from which meters

19  could possibly be removed.

20  Only five days later, two investigators who worked

21  under Penman's supervision accompanied two housing code

22  enforcement officers to the Arden-Guthrie area for a

23  "cursory inspection."  When the sweeps began about a

24  month later, the first 35 buildings swept were, with

25  two exceptions, the buildings included on Edwins' list

26  provided to Penman.

27  Of course, a jury might reject the plaintiffs' claim

28  that the defendants were motivated by a desire to

**21**

1    deflate the value of the plaintiffs' buildings,

2    purchase them, and replace them with a shopping center.

3    However, if proven at trial, the facts alleged by the

4    plaintiffs are sufficient to support a claim of a

5    violation of the equal protection clause.

6  *Armendariz*, 75 F.3d at 1327.

7    In *Lockary*, plaintiffs stated an equal-protection claim by

8  raising triable issues of fact as to whether the water shortage

9  asserted as the rationale for denying water hookups was

10 pretextual.  Affidavits showed that, after the imposition of a

11 moratorium on new water hookups allegedly due to a water

12 shortage, local water consumption rose by seventy percent, water

13 storage capacity increased by a factor of twelve, and that

14 defendant utility had provided water for secondary units and

15 swimming pools, had voluntarily relinquished rights to certain

16 water sources, had a leakage rate double that of accepted norms,

17 and had sufficient water to permit population growth.  *Lockary*,

18 917 F.2d at 1155-56.

19   Here, Plaintiff's conclusory allegation of pretext, that the

20 City was "out to get him," because the fire had embarrassed the

21 City, is unsupported by evidence of animus by word or act of

22 anyone associated with the City.  That the City took precautions

23 and actions to protect the public against a recurrence of a

24 public nuisance and public liability and hazards created by

25 Plaintiff's fire, having been "once burned," does not constitute

26 improper or unjustified discrimination in revoking Plaintiff's

27 CUPs.  Revoking Plaintiff's CUPs was not a completely irrational

28 response to Plaintiff's consequential violations of his CUPs'

**22**

1  conditions.  The magnitude of the costs and harm to the

2  environment those violations imposed upon the City fully

3  justified revocation of Plaintiff's CUPs.  Plaintiff proved

4  himself to be an unreliable operator, who lacked financial

5  resources, and intentionally defied a cease-and-desist order.

6  All were valid non-pretextual reasons to revoke Plaintiff's CUPs.

7  2.  Alleged Delays in the Issuance of Demolition Permits

8       Plaintiff claims that the City violated Plaintiff's right to

9  equal protection by applying, only to him, a procedure for the

10  issuance of demolition permits that resulted in delays.  Doc. 81,

11  Mem. in Opp., 9-10, 19.  As a demolition contractor, Plaintiff

12  periodically needed to obtain demolition permits from the City,

13  which are issued by the Building and Safety Division.  The City

14  concedes that on March 7, 2003, at the direction of City Manager

15  Hobbs, a notation was put into the Building and Safety Division's

16  computer system which required staff to obtain Director Yovino's

17  personal approval for each demolition permit issued to Plaintiff.

18  Id., 10; Doc. 99, Resp. in Supp., 5.  There is no dispute

19  Plaintiff' was thereby singled out for special scrutiny.

20       In the permitting process, a period of several days on one

21  occasion is the longest Plaintiff alleges any particular

22  demolition permit issuance was delayed.  Doc. 81, Mem. in Opp,

23  10.  Most of the "delays" amounted at most to hours.  Id.

24  Plaintiff obtained every demolition permit for which he applied

25  after the fire.  Plaintiff admits he has never lost any work on

26  account of the alleged delays in demolition permit issuance.

27  SUMF, ##78, 79.

28       The City defends its policy:

**23**

1     After the fire and all the problems associated

2     therewith, the upper levels of City management wanted

3     to be apprised of Plaintiff's business activities with

4     the City.  Given the recent history, Plaintiff's

5     disrespect for public safety and welfare, his violation

6     of laws and ordinances, and the catastrophic events

7     that took place on his property, it was completely

8     rational for the City to undertake this action.

9 Doc. 92, Resp. in Supp., 5.

10     Plaintiff cites only *Carpinteria Valley Farms, Ltd. v.*
11 *County of Santa Barbara*, 344 F.3d 822 (9th Cir. 2003).  *See* SUMF,
12 #78.  In *Carpinteria*, plaintiff landowner alleged in a Section
13 1983 action, *inter alia*, equal protection violations based on the
14 county's delay in issuing a conditional use permit for his
15 projected building of a polo course on his property.  *Carpin-*
16 *teria*, 344 F.3d at 830.  The delay at in that case was nine
17 years.  *Id*.  Plaintiff alleges no such unreasonable delay in this
18 case.

19     In *SeaRiver Maritime Holdings, Inc. v. Mineta*, 309 F.3d 662
20 (9th Cir. 2002), the owners and operator of the former *Exxon*
21 *Valdez* challenged on class-of-one equal-protection grounds a
22 federal statute that singled out the tanker for exclusion from
23 the waters of Prince William Sound.  SeaRiver "argue[d] that
24 burdening one ship by excluding it from Prince William Sound
25 results in treatment unequal to other ships that have in the past
26 spilled large amounts of oil," and, like Plaintiff in this case,
27 alleged that the disparate treatment arose from political animus.
28 *SeaRiver*, 309 F.3d at 679.

**24**

1    The court upheld the statute, holding,

2    It is reasonable for Congress to single out the *Exxon*

3    *Valdez* due to the magnitude of the spill and the

4    sensitivity of the area where the spill occurred.  *It*

5    *is also rational for Congress to use this past disaster*

6    *as a measure of future performance* to specifically bar

7    the Exxon Valdez from transporting oil through Prince

8    William Sound, an area that Congress has accorded

9    special statutory protection.

10   *Id*. (emphasis added).

11       Plaintiff claims that his son, Archie Lee Crippen, is

12   situated similarly to Plaintiff, but was treated differently

13   regarding the issuance of demolition permits.  As set forth in

14   Archie Lee Crippen's declaration: (1) he is an excavation and

15   demolition contractor holding Class A (general engineering) and

16   Class C21 (demolition) licenses from the California Contractors

17   State License Board; (2) he learned the demolition business from

18   Plaintiff; (3) he worked full-time for his father for twenty-two

19   years until 1993, when he left and formed his own business; (4)

20   he has performed many competitively bid demolition contracts for

21   the City; (5) he has hauled hundreds of truck loads of

22   construction debris to Plaintiff's property; (6) he has two

23   criminal convictions; (7) he has an un-permitted structure on his

24   property; (8) he has violated a City red tag order; (9) he has

25   sued public entities, and in one case recently obtained a verdict

26   against the State.  Doc. 81, Mem. in Opp., 19.

27       These circumstances do not make Archie Lee Crippen's

28   business and activities comparable to Plaintiff's.  Based on the

**25**

magnitude of environmental and liability problems, Plaintiff's threatening public health and safety at great public expense, his lack of financial responsibility and inability to remediate the problems he was responsible for, Plaintiff was justifiably singled out as a financially irresponsible and uncooperative operator who needed to be particularly scrutinized.  In view of his undisputed failings as an operator of the dump site, the City was fully justified in taking a close look at each demolition permit Plaintiff sought, to determine his ability to perform under each bid's terms and conditions.  It was rational for the City to apply closer scrutiny and review before it issued demolition permits to Plaintiff, given the past disaster for which the Commission found him to be largely responsible, and the likelihood that new demolition jobs would generate more debris which would be deposited at Plaintiff's recycling site.  *See* Order, *supra* at 11 (preclusive effect of this determination).

3.    The City's Rejection of Plaintiff's Bid on the Grounds that He was a "Non-Responsible Bidder"

Section 1208 of the Fresno City Charter requires that every contract subject to competitive bidding be let to the lowest "responsive and responsible" bidder.  The City Council may reject any and all bids presented and re-advertise in its discretion. Fresno City Charter § 1208(a), (a)(4).

In 2002, the City posted an invitation to bid for the demolition of a building on 226 East Whites Bridge Avenue.  SUMF, #34.  On March 25, 2003, Plaintiff was the low bidder for the contract.  Doc. 81, Mem. in Opp, 10; Decl. of Janet Smith, ¶ 3.

The City then rejected all bids.  SUMF, #35.  In the

**26**

interim, the Council passed Resolution No. 2003-129, which
provides a definition for the term "non-responsible bidder,"
which Charter Section 1208 had not previously included:

> A non-responsible bidder includes, but is not limited
> to, one who does not possess the skill, judgment,
> financial or functional ability, or integrity to
> perform satisfactorily the proposed contract[.]

Resol. No. 2003-129.

The City then re-bid the contract, and Plaintiff was again
the low bidder.  SUMF, #36.  The City subsequently determined
that Plaintiff was a non-responsible bidder and sent him a letter
advising him of the reasons for its determination.  SUMF, #37.
On Plaintiff's appeal to a hearing officer, the determination was
upheld.  SUMF, ##38-40.  The contract was later awarded to
Plaintiff's son, Archie Lee Crippen.  SUMF, #41.

The letter the City sent to Plaintiff stated as one reason
for its determination that Plaintiff was a non-responsible bidder
and for its rejection of Plaintiff's low bid, the fact that the
project required "the removal and legal disposal of all rubbish
and debris."  The letter also cited as grounds, the recent
revocation of Plaintiff's CUPs for multiple violations, and his
defiance of a cease-operations order.

> As the principal owner of Archie Crippen Excavation,
> Archie C. Crippen has demonstrated that he does not
> possess the judgment, functional ability, or integrity
> to perform satisfactorily the proposed contract.

Decl. of Janet Smith, Ex. B.

Plaintiff has not submitted evidence that the City's

**27**

1  determination was an irrational exercise of its discretion or
2  that it was based on false or contrived grounds.  Plaintiff did
3  not seek judicial review of the City's administrative non-
4  responsible bidder determination.   These administrative decisions
5  are also claim-preclusive.  *Olson*, 188 F.3d at 1086-87.  The City
6  could rationally determine that Plaintiff lacked the financial
7  ability to successfully prosecute the demolition contract, since
8  he expressly represented to the City that he was financially
9  unable to dispose of the debris remaining on his property
10 (shifting the cost to the City).  The City's determination that
11 Plaintiff lacked the judgment and integrity to do so is likewise
12 not irrational, given Plaintiff's numerous violations of his
13 CUPs, and his defiance of a City-issued cease-operations order.

14      Plaintiff also claims that Archie Lee Crippen was situated
15 similarly to him for the purposes of the non-responsible bidder
16 determination.  Doc. 81, Mem. in Opp., 20.  This argument fails
17 for the same reasons it failed regarding the demolition permits
18 delay, *supra*.

19                          **VI.   CONCLUSION**

20      Although this decision includes factual as well as legal
21 analysis, no material facts are in dispute on Plaintiff's claims.
22 There is no question that Plaintiff was singled out based on his
23 performance failures, lack of financial responsibility, and
24 intentional violation of a justified stop order.  Plaintiff's
25 failure to pursue judicial review of the City's actions against
26 him on CUPs, responsible bidder status, and demolition permits
27 bars litigation of these federal civil rights claims.

28      For all the reasons stated above, the City's motion for

**28**

1   summary judgment is GRANTED.

2   **SO ORDERED**

3   **DATED: May _4__ , 2006.**

4

5                                   **/s/ OLIVER W. WANGER**

6                                   _____

7                                        **OLIVER W. WANGER**

8                                   **United States District Judge**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28